NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **MERRICK BANK CORP.,** | : |
| *Plaintiff,* | : Civil Action No. 13-7756 |
| | : |
| | : OPINION |
| v. | : |
| | : March 31, 2015 |
| **VALLEY NATIONAL BANK,** | : |
| *Defendant.* | : |

**ARLEO**, UNITED STATES DISTRICT JUDGE.

Before this Court is Defendant Valley National Bank's ("Valley") motion to dismiss Counts One, Five, Seven, Eight, and Ten of the Second Amended Complaint (the "SAC") pursuant to Federal Rule of Civil Procedure 12(b)(6) [Dkt. No. 26]. Plaintiff Merrick Bank Corporation ("Merrick") opposes Valley's motion. No oral argument was heard pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth herein, Valley's motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**.

I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This case arises out of Valley's alleged mismanagement of an escrow account that was created pursuant to a depository agreement with a charter air company named Myrtle Beach Direct Air ("Direct Air"). Dkt. No. 23-2, SAC ¶¶ 1, 17. The purpose of the account was to ensure that sufficient funds were available to refund Direct Air customers in the event that their flights were canceled. Id. ¶¶ 2-3. Valley is a national banking association headquartered in Passaic, New

Jersey. Id. ¶ 11. Merrick is a Utah corporation that operates as an "acquiring bank" for merchants in credit card transactions. Id. ¶¶ 10, 14. In that capacity, Merrick serves essentially as a link in the chain whenever a customer uses a credit card.

A credit card purchase typically involves four parties: (1) the cardholder; (2) the cardholder's bank (the "issuing bank"); (3) the merchant's acquiring bank; and (4) the merchant. Id. ¶ 15. When the cardholder makes a purchase, the issuing bank sends the funds to cover the purchase to the acquiring bank, which then forwards those funds to the merchant, thus completing the chain. Id. When a cardholder seeks a refund of a credit card charge, the chain again begins with the issuing bank, which initiates a "chargeback" that "requires the acquiring bank to immediately return the funds back to the issuing bank." Id. ¶ 16. The onus is then left on the acquiring bank to recover the funds from the merchant. Id. Essentially, then, the acquiring bank bears the risk of loss in the event that it is unable to collect from the merchant. As Direct Air's acquiring bank, Merrick's inability to collect approximately $25 million in chargebacks from Direct Air after Direct Air ceased operations in 2012 represents the genesis of the instant lawsuit. See id. ¶¶ 48, 54, 55 n.2.

Merrick served as Direct Air's acquiring bank under an agreement between Merrick, Direct Air, and JetPay Merchant Services, LLC ("JetPay").[1] Id. ¶¶ 17-18. From 2007 until its demise in March 2012, Direct Air provided charter air services, which included arranging flights and tour accommodations. Id. ¶¶ 19-20. Pursuant to the Federal Aviation Act, 49 U.S.C. §§ 40101, et seq. (the "FAA"), the Department of Transportation ("DOT") has promulgated at 14 C.F.R. § 380

---

[1] JetPay is an independent sales organization that identifies prospective merchants for which Merrick can serve as acquiring bank. SAC ¶ 18. JetPay has also sued Valley in this Court. See JetPay Merchant Services, LLC, et al. v. Valley National Bank, Civil Action No. 14-7827. JetPay's role is not relevant to the instant motion.

("Part 380") extensive regulations on public charter operators such as Direct Air. Id. ¶ 21. In particular, the DOT requires public charter operators to protect their customers financially in the event that a flight is canceled. Id. ¶ 22. In order to provide such protection, charter operators must choose from two options, one of which requires the charter operator to set up a depository account with an FDIC-insured bank. See id. ¶¶ 23. Only that option is relevant here because it is the option—and Valley is the FDIC-insured bank—that Direct Air chose. Id. ¶¶ 24-25.

In accordance with 14 C.F.R. § 380.34, the depository account served essentially as an escrow account in which the payments made by Direct Air customers were held until Valley received confirmation that the customers' flights had been completed. See id. ¶ 2. Thus, Merrick alleges that there theoretically should have always been sufficient money in the account to refund customers for cancelled flights. Id. ¶ 3. Indeed, under DOT regulations and the various depository agreements into which Valley entered with Direct Air, Valley was subject to a number of requirements with respect to its handling of funds from Direct Air customers. See id. ¶ 39.

For example, Valley was required to keep funds segregated "by charter, flight or rotation" and could disburse funds for a given charter only after receiving a certification from the direct air carrier that the flight had indeed been completed. Id. In addition, Valley was required to refund Direct Air customers directly after notification from Direct Air that a given flight had been cancelled. Id. Merrick states that the security provided by this escrow account played an important role in the decision to take Direct Air on as a client. Id. ¶ 44. In fact, Merrick states that before entering into its agreement with Direct Air, it specifically confirmed that Valley would serve as Direct Air's depository bank and relied on Valley's representations that it would serve in that capacity in accordance with DOT regulations. Id. ¶¶ 45-46.

3

In March 2012, however, Direct Air ceased operations and then filed for bankruptcy protection, which caused "the cancellation of tens of thousands of prepaid charter reservations." Id. ¶¶ 48-50.  As a result of these cancellations, Direct Air customers initiated the chargeback process, which ultimately prompted Merrick to pay $26.2 million in chargebacks.  Id. ¶ 51. Merrick then looked to Direct Air's depository account with Valley for reimbursement, which contained only $1 million at the time Direct Air ceased operations.  Id. ¶ 55.  Ultimately, Merrick was able to recoup approximately $670,000 from the depository account.  Id. ¶ 55 n.2.  Merrick claims that if the proper procedures had been followed, the depository account would have contained a balance at least equal to the $26.2 million in chargebacks that Merrick was forced to pay.  Id. ¶ 54.  While Merrick acknowledges that Direct Air's wrongdoing was the direct cause of the shortfall in the account, it claims that the shortfall could have been prevented had Valley followed DOT regulations or fulfilled its obligations as an escrow fiduciary.  Id. ¶¶ 56-57.

More specifically, Merrick alleges that Valley failed to segregate funds as required by the DOT regulations and the depository agreements.  Id. ¶ 61.  Instead, Valley would simply deposit daily credit card receipts for future flights in an "unallocated" sub-account.  Id. ¶ 61(a)-(b).  The funds were not identified with a particular flight until the flights had already flown; at that point, Direct Air would request release of the funds and Valley would then aggregate the amounts from several flights and immediately wire that aggregate amount to Direct Air.  Id. ¶ 61(c)-(e).  Valley never sought to match Direct Air's claimed receipts to the receipts in the depository account, and the bank's process essentially left it with no ability to identify the funds that corresponded to specific future flights.  Id. ¶ 61(f)-(i).

Merrick alleges that Valley violated DOT regulations and failed in its role as Direct Air's depository bank in myriad other ways, including, *inter alia*: (1) failing to record passenger names

4

in accordance with the depository agreements and Valley's own internal guidelines; (2) disbursing undifferentiated and unsegregated funds to Direct Air for Direct Air's "Family Ties" program in violation of DOT regulations; (3) releasing funds to Direct Air without a certification from the direct air carrier that the flight had occurred; (4) releasing funds without having received a certified invoice from Direct Air in accordance with DOT regulations; (5) failing to ever compare Direct Air's actual receipts with its claimed receipts or to question whether the balance in the account was appropriate in light of the amount of advanced bookings; and (6) accepting Direct Air's claims regarding the source of its receipts at face value, even though, as Merrick alleges, they were clearly facially implausible.  See id. ¶¶ 62-68.

In sum, Merrick claims that Valley's operation of the depository account more closely resembled a checking or demand account from which Direct Air could seek disbursement of funds at any time and for any reason. Id. ¶ 69. Valley's shortcomings in operating the depository account ultimately resulted in a September 2013 DOT Consent Order that imposed $125,000 in civil penalties and found Valley's operation of the account to be an unfair and deceptive business practice. Id. ¶¶ 6-7, 76-77. Merrick claims that this Consent Order came on the heels of a previous consent order in which the DOT found that Valley violated DOT regulations in servicing another depository account. See id. ¶¶ 78-80. Merrick claims that Valley nevertheless failed to change its policies and procedures to ensure compliance with the regulations. Id. ¶ 81.

Merrick alleges that Valley's failures in operating the depository account breached Valley's duties and obligations under the DOT regulations, the depository agreements, and the common law. Id. ¶ 71. These breaches, in turn, resulted in the shortfall in the depository account that forced Merrick to bear the losses that the Direct Air customers would have borne in the absence of credit card regulations that required Merrick to reimburse them after Direct Air ceased

5

operations. Id. ¶¶ 72-73. Merrick thus states that it is equitably subrogated to the customers' claims for those losses. Id. ¶ 74. In addition, Merrick claims that it suffered direct losses as a result of Valley's negligent/grossly negligent misrepresentation "that it was operating the depository account in accordance with DOT Regulations." Id. ¶ 75.

Merrick filed this action on December 20, 2013. See Dkt. No. 1, Compl. On August 19, 2014, Merrick filed the SAC, which alleges the following ten: (1) breach of contract on behalf of Direct Air customers as intended third-party beneficiaries of the depository agreements; (2) negligence/gross negligence; (3) breach of fiduciary duty; (4) negligent misrepresentation; (5) aiding and abetting fraud; (6) conversion/aiding and abetting conversion; (7) violation of 14 C.F.R. § 380; (8) consumer fraud on Merrick and Direct Air customers; (9) breach of contract on behalf of Direct Air as assignee of the bankruptcy trustee's claims against Valley; and (10) consumer fraud on Direct Air. See SAC ¶¶ 82-141.

Valley filed this partial motion to dismiss the First, Fifth, Seventh, Eighth, and Tenth Causes of Action. See Dkt. No. 26, Mot. to Dismiss. The Court will address the parties' arguments as to each of those counts in turn.

## II. DISCUSSION

### A. The Rule 12(b)(6) Standard

Under Rule 8 of the Federal Rules of Civil Procedure, a pleading is sufficient so long as it includes "a short and plain statement of the claim showing that the pleader is entitled to relief" and provides the defendant with "fair notice of what the . . . the claim is and the grounds upon which it rests. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)) (internal quotations omitted). In considering a Rule 12(b)(6) motion to dismiss, the court accepts as true all of the facts in the complaint and draws all reasonable

inferences in favor of the plaintiff. Phillips v. Cnty. of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008). Moreover, dismissal is inappropriate even where "it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." Id.

While this standard places a considerable burden on the defendant seeking dismissal, the facts alleged must be "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555. That is, the allegations in the complaint "must be enough to raise a right to relief above the speculative level." Id. Accordingly, a complaint will survive a motion to dismiss if it provides a sufficient factual basis such that it states a facially plausible claim for relief. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). In order to determine whether a complaint is sufficient under these standards, the Third Circuit requires a three-part inquiry: (1) the court must first recite the elements that must be pled in order to state a claim; (2) the court must then determine which allegations in the complaint are merely conclusory and therefore need not be given an assumption of truth; and (3) the court must assume the veracity of well-pleaded factual allegations and ascertain whether they plausibly give rise to a right to relief. Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010).

B. Analysis

   1. Count Seven: Violation of 14 C.F.R. § 380

Valley argues that Count Seven alleging violation 14 C.F.R. § 380[2]—which regulates public charters such as Direct Air—must be dismissed because neither an express nor an implied private right of action exists under the FAA. This Court agrees.

---

[2] More specifically, Merrick alleges violation of 14 C.F.R. § 380.34, which regulates the depository agreements into which Valley entered with Direct Air.

Because the relevant inquiry in determining whether a private right of action exists is whether Congress intended such a result, the Court must focus on the statute and not on the implementing regulations. See Transamerica Mortg. Advisors, Inc. v. Lewis, 444 U.S. 11, 16 (1979). A private right of action under a particular statute may be either express or implied. See Touche Ross & Co. v. Redington, 442 U.S. 560, 568 (1979). Here, there is no dispute that Congress did not expressly create a private right of action covering the conduct at issue here.[3] The question, then, is whether there exists an implied private right of action under 49 U.S.C. § 41112, the section of the FAA pursuant to which Part 380 was implemented.

Whether an implied private right of action exists is dependent upon the answers to a two-part inquiry: (1) whether Congress intended to create a personal right; and (2) whether Congress intended to create a private remedy. Wisniewski v. Rodale, Inc., 510 F.3d 294, 301 (3d Cir. 2007). If both of those questions are answered in the affirmative, then a court is permitted to find a private right of action under the statute in question. Id. In examining each question, the reviewing court's inquiry must always begin with the statutory text and structure. See Alexander v. Sandoval, 532 U.S. 275, 288 (2001). Finally, where it is clear that Congress does not intend to create a personal right, the reviewing court need not ask whether Congress intended to create a private remedy. See Gonzaga Univ. v. Doe, 536 U.S. 273, 286 (2002).

With respect to the first question, the central focus of the inquiry is whether the statute uses "rights-creating" language. Wisniewski, 510 F.3d at 301-02. Such "rights-creating" language places the emphasis on a person or class of persons to be protected. Sandoval, 532 U.S. at 289.

---

[3] The FAA's only express private right of action is found at 49 U.S.C. § 46108, and that section deals specifically with private enforcement of the requirement that an air carrier hold a certificate in accordance with 49 U.S.C. § 41101(a)(1). See Bonano v. E. Caribbean Airline Corp., 365 F.3d 81, 85 (1st Cir. 2004).

Such language is distinguished from statutes that focus on the person or entity to be regulated or on the government agency that must do the regulating.  Id.  Here, the relevant section of the FAA reads as follows:

> To protect passengers and shippers . . . the Secretary may require the carrier to file a performance bond or equivalent security in the amount and on terms the Secretary prescribes.  The bond or security must be sufficient to ensure the carrier adequately will pay the passengers and shippers when the transportation the carriers agrees to provide is not provided.  The Secretary shall prescribe the amounts to be paid under this subsection.

49 U.S.C. § 41112(b) (emphasis added).  Fairly read, this language is focused not on a person or class of persons to be protected, but on the regulator and the entity to be regulated (the carriers).  Indeed, as the multiple references to the Secretary of Transportation and carriers show, the statute's focus is plainly on issuing directives to the Secretary with regard to the regulation of air carriers, which gives this Court "far less reason to infer a private remedy in favor of individual persons." Sandoval, 532 U.S. at 289.

According to Merrick, however, the opening clause of the statute referring to "passengers and shippers" provides the requisite rights-creating language.  But that argument completely ignores the multiple directives subsequently given to the Secretary.  Stated differently, the argument ignores the core inquiry: whether the language focuses on a person or class of persons to be protected.  Following Merrick's logic, congressional intent to create a personal right could be found whenever a statute happens to confer some collateral protection or benefit on a class of persons.  That is not the law.   The Court is therefore satisfied that § 41112 is purely regulatory in nature and that Congress did not intend to create a personal right.

This reasoning is in accord with both the clear purpose of the FAA and the few decisions of other courts in which this precise issue has been addressed.  First, the congressional purpose in enacting the FAA was to vest the authority to regulate the aviation industry in a single federal

9

agency. See Abdullah v. Am. Airlines, Inc., 181 F.3d 363, 368-70 (3d Cir. 1999). That is, the goals of the FAA were purely regulatory in nature—Congress was concerned only with creating a new federal agency that could "provide for the safe and efficient use" of the nation's airspace. H.R. Rep. No. 85-2360 (1958). Thus, in Bonano v. E. Caribbean Airline Corp., 365 F.3d 81 (1st Cir. 2004), the First Circuit directly considered whether a private right of action could be implied under Part 380. Id. at 82. Focusing on the fact that the FAA "comprises a general regulation of activities and does not focus on a benefited class," the Court found that no private right of action existed. Id. at 85. Finally, in a case with facts very similar to the facts presented here, a district court also rejected the plaintiff merchant bank's contention that an implied private right of action existed under Part 380. See Synovus Bank of Tampa Bay v. Valley National Bank, 487 F. Supp. 2d 360, 362-66 (S.D.N.Y. 2007). Therefore, this Court is convinced that Congress did not intend to create a private right of action.[4] Count Seven is thus dismissed with prejudice.

## 2. Count One: Breach of Contract

Merrick alleges breach of the depository agreements into which Valley entered with Direct Air on the theory that Direct Air's customers were intended third party beneficiaries to those contracts. Merrick's claim hinges on a paragraph in the depository agreements that specifically mentions the customers and identifies actions that must be taken on their behalf. By contrast, Valley argues that the clear disclaimer of intent to benefit third parties controls and demonstrates

---

[4] The Court also notes that the Third Circuit has consistently declined to imply a private right of action under the FAA in a variety of contexts, even before the Supreme Court decided Sandoval. See, e.g., Rauch v. United Instruments, Inc., 548 F.2d 452 (3d Cir. 1976); Wolf v. Trans World Airlines, Inc. 544 F.2d 134 (3d Cir. 1976); Polansky v. Trans World Airlines, Inc., 523 F.2d 332 (3d Cir. 1975). One court in this Circuit has even gone so far as to state categorically that there is no implied private cause of action under the FAA in any context. See Pease v. Lycoming Engines, No. 10-843, 2011 WL 3667562, at *5 (M.D. Pa. Aug. 22, 2011).

that the parties did not intend to confer any third party beneficiary rights on Direct Air's customers.[5]  This Court agrees.

Under New Jersey law, a party may have standing to sue as a third party beneficiary to a contract only where the parties to the contract "intended others to benefit from the existence of the contract." Broadway Maint. Corp. v. Rutgers, State Univ., 90 N.J. 253, 259 (1982).  Accordingly, third party beneficiary status is not warranted in instances where the third party's benefit "arises merely as an unintended incident of the agreement." Id.  The critical inquiry is therefore whether the parties intended "to recognize a right of performance in the third party." Grant v. Coca-Cola Bottling Co. of N.Y., Inc., 780 F. Supp. 246, 249 (D.N.J. 1991).  Without such intent, the third party is merely an incidental beneficiary without standing to sue on the contract. Broadway, 90 N.J. at 259.  In determining the parties' intent, the reviewing court must consider all of the terms of the contract and the surrounding circumstances. Grand St. Artists v. Gen. Elec. Co., 19 F. Supp. 2d 242, 253 (D.N.J. 1998).

The Court is convinced that the language of the depository agreement demonstrates a lack of intent to confer a benefit upon Direct Air's customers.[6]  In opposition, Merrick points to Paragraph 2.1(c) in which Valley agrees to remit refund checks to Direct Air's customers directly whenever a charter is cancelled. Dkt. No. 11-1, Ex. A ¶ 2.1(c).  While the customers' ability to receive a direct refund is obviously of some benefit, the language of 2.1(c) hardly represents "an

---

[5] Valley does not argue that Merrick's underlying breach of contract claim is inadequately pled. The Court is therefore satisfied that Merrick adequately pleads the necessary elements for that claim.

[6] Merrick explicitly references the depository agreements in the SAC, see SAC ¶¶ 28-29, and attached it as Exhibit A when filing the first amended complaint. See Dkt. No. 11-1, Ex. A. Merrick's failure to attach the sample agreement when filing the SAC appears to have been an oversight, as both parties rely on the language in the agreement in their briefs.  The Court rightly considers the language in the sample agreement because the document is explicitly relied upon in the SAC. See In re Burlington Coat Factory Securities Litig., 114 F.3d 1410, 1426 (3d Cir. 1997).

explicit indication by the parties that not only is the claimant an incidental beneficiary of the proposed arrangement, but also that it will have a direct claim under the contract." Dravo Corp. v. Robert B. Kerris, Inc., 655 F.2d 503, 510 (3d Cir. 1981). Given the fact that New Jersey courts are "hesitant to imply a third-party beneficiary obligation without" such explicit language, id., the Court is unconvinced that Paragraph 2.1(c) clearly evinces an intent to confer a right of performance on Direct Air's customers.

More importantly, the unequivocal language in Paragraph 7.12 makes clear that the parties did not intend to confer third-party beneficiary status on Direct Air's customers:

> Except as otherwise may be provided by law, this Agreement is for the <u>sole benefit of the parties hereto</u> and their permitted assigns and <u>nothing herein</u>, <u>express or implied</u>, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this agreement."

Dkt. No. 11-1, Ex. A ¶ 7.12. The language of Paragraph 7.12 is clear: Direct Air and Valley did not intend the contract to benefit any third parties. Cf. Agostino v. Quest Diagnostics, Inc., No. 04-4362, 2011 WL 5410667, at *5-6 (D.N.J. Nov. 3, 2011) (express disclaimer of intent to confer third-party beneficiary status negated other language in agreement suggesting such an intent). Merrick has pled no facts or surrounding circumstances that would suggest otherwise. Therefore, Count One is dismissed without prejudice.[7]

### 3. Count Five: Aiding and Abetting Fraud

Count Five alleges that Valley aided and abetted fraud committed by Direct Air against its customers. In order to state an aiding and abetting claim, the following elements must be pled:

---

[7] Merrick additionally argues that the exception contained in the first clause of Paragraph 7.12 applies here, since the DOT regulations are the requisite law that confers benefits on Direct Air's customers as third parties. Because no private cause of action exists under the DOT regulations, the regulations cannot be the basis for invoking that exception.

"(1) the commission of a wrongful act; (2) knowledge of the act by the alleged aider-abettor; and (3) the aider-abettor knowingly and substantially participated in the wrongdoing." Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C., 331 F.3d 406, 415 (3d Cir. 2003). In moving to dismiss this cause of action, Valley argues that Merrick fails to plead Direct Air's underlying fraud with sufficient particularity.

In addition to the general pleading requirements of Rule 8, Rule 9(b) requires any claims of fraud to be pled with particularity. The Rule exists to ensure that defendants are apprised of the "precise misconduct with which they are charged" so as to protect them from "spurious charges of immoral and fraudulent behavior." Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984). Plaintiffs can satisfy this particularity requirement in one of two ways: (1) by pleading the "date, place or time" of the alleged fraud; or (2) through use of other means that serve to "inject[] precision and some measure of substantiation into their allegations of fraud." Lum v. Bank of Am., 361 F.3d 217, 224 (3d Cir. 2004) (internal quotations and citations omitted). In addition, Rule 9(b) also requires a plaintiff to "allege who made a misrepresentation to whom and the general content of the misrepresentation." Id.

The Court is satisfied that Merrick meets the heightened pleading requirements of Rule 9(b). Indeed, Merrick provides substantial detail regarding the alleged fraudulent activity with which it charges Direct Air. For example, Paragraph 63 of the SAC provides a detailed account of Direct Air's fraudulent use of its "Family Ties" voucher program, which allowed it to withdraw funds for the same charges twice. See SAC ¶ 63. In addition, Paragraph 68 describes Direct Air's fraudulent categorization of its receipts as "Cash," which enabled Direct Air to request disbursement of funds to which it was not entitled. See id. ¶ 68. Finally, the surrounding paragraphs describe in substantial detail Valley's role in Direct Air's fraud. See generally ¶¶ 56-

69. While the SAC does not plead the exact date, place, or time of the alleged fraud, the Court is convinced that the SAC's allegations are sufficiently precise so as to put Valley on notice of the misconduct alleged. See Lum, 361 F.3d at 224. Therefore, Valley's motion to dismiss Count Five is denied.

### 4. Counts Eight and Ten: Consumer Fraud

In Count Eight, Merrick alleges violations of the New Jersey Consumer Fraud Act (the "CFA") both on its own behalf and on behalf of Direct Air's customers as their subrogee. In Count Ten, Merrick makes substantially the same allegations on behalf of Direct Air as the assignee of Direct Air's claim. In seeking dismissal of these counts, Valley's argument is twofold. First, Valley contends that the New Jersey Consumer Fraud Act (the "CFA") is inapplicable under New Jersey choice of law rules. Second, Valley argues that even if the CFA is applicable, Merrick fails to state a claim. Because the Court finds that the CFA is inapplicable, the Court will address only the first issue.

#### a. Choice of Law Analysis

A federal court sitting in diversity must apply the choice of law rules of its forum state in determining which law governs the case. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). Thus, this Court must apply New Jersey law, which employs the two-part "most significant relationship" test described in the Restatement (Second) of Conflict of Laws (the "Restatement"). Maniscalco v. Brother Int'l (USA) Corp., 709 F.3d 202, 206 (3d Cir. 2013) (citing P.V. ex rel. T.V. v. Camp Jaycee, 197 N.J. 132, 142–43 (2008)). In the first step of the test, the Court must determine whether an actual conflict exists between the states' laws under consideration. Camp Jaycee, 197 N.J. at 143. In the absence of an actual conflict, the court need not inquire any further and New Jersey law will apply. Lebegern v. Forman, 471 F.3d 424, 430

(3d Cir. 2006). If, however, the court does find an actual conflict, the analysis must continue to the second step. Cooper v. Samsung Elecs. Am., Inc., 374 F. App'x 250, 254 (3d Cir.2010).

The parties do not dispute that an actual conflict exists, and the Court is satisfied that there is indeed an actual conflict. See Skeen v. BMW of N. Am., LLC, No. 13-1531, 2014 WL 283628, at *5 (D.N.J. Jan. 24, 2014) (noting that the CFA is among the strongest consumer fraud laws in the nation and that a conflict could be found between the CFA and the law of another state for any of a number of reasons). The analysis therefore moves to the second step.

At the second step, it must be determined which of the competing jurisdictions has the "most significant relationship" to the claims at issue. Maniscalco, 709 F.3d at 207. Where the claims at issue sound in fraud, like the claims at issue in this case, the Court must consider the factors outlined at § 148(2) of the Restatement:[8] (a) where the plaintiff relied on the representation; (b) where the plaintiff received the representation(s); (c) where the defendant made the representation; (d) the parties' "domicile, residence, nationality, place of incorporation and place of business"; (e) if a tangible thing forms the subject of the underlying transaction, where the thing was located at the time of the transaction; and (f) if applicable, where the plaintiff must render performance of a contract into which he or she was fraudulently induced. Id.; Restatement § 148(2). The relative weight that courts should assign to each of these factors is informed by the principles embodied in § 6 of the Restatement. Restatement § 148(2) cmt. e. The New Jersey Supreme Court has described those principles as: "(1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of tort law; (4) the interests of judicial

---

[8] Because the parties do not dispute that § 148(1) is inapplicable here, the Court focuses only on the factors laid out at § 148(2).

administration; and (5) the competing interests of the states." Camp Jaycee, 197 N.J. at 147 (internal quotations omitted).

The Court begins its analysis with the § 148(2) factors as they apply to the CFA claim that Merrick brings on its own behalf. As an initial matter, the Court finds that only factors (a)-(d) apply in this case.[9] Factors (a) and (b)—the place where the plaintiff received and relied on the representation—clearly weigh against application of the CFA, since Merrick is a Utah corporation with its principal place of business in South Jordan, Utah. SAC ¶ 10. Therefore, Merrick would have received and relied upon any representations made by Valley in Utah. Nothing in the SAC suggests a different conclusion. Accordingly, those factors weigh in favor of applying Utah consumer fraud law. In addition, factor (d), which considers in relevant part the parties' respective places of business, weighs slightly in favor of the application of Utah law. The Restatement teaches that in cases involving corporations, the location of the plaintiff's place of business is a more important contact than is the location of the defendant's. See Restatement § 148(2) cmt. i. See also Maniscalco, 709 F.3d at 208. Here, Merrick's principal place of business is located in South Jordan, Utah, while Valley's principal place of business is located Passaic, New Jersey. SAC ¶¶ 10-11. Thus, factor (d) also weighs against application of the CFA. As for factor (c), Merrick alleges that all of Valley's representations emanated from New Jersey, and the Court accepts that allegation as true for the purposes of this motion. But this single contact, standing alone, is simply insufficient to warrant application of New Jersey law. See Maniscalco, 709 F.3d at 208-09 (holding same and collecting cases in support of the proposition). Utah law therefore applies to Merrick's individual consumer fraud claim. Accordingly, Count Eight is dismissed as

---

[9] Although Merrick argues otherwise, factor (e) does not apply because an escrow account is not a tangible thing. Indeed, by its very nature, a bank account is an intangible thing. With respect to factor (f), neither party disputes that it is inapplicable.

to Merrick without prejudice to Merrick's right to replead its claim pursuant to Utah consumer fraud law.

Count Ten must also be dismissed for the same reasons articulated above. Merrick alleges that Direct Air was based in Myrtle Beach, South Carolina. SAC ¶ 19. There are no allegations in the SAC suggesting that Direct Air's receipt or reliance upon any representations by Valley occurred in New Jersey. The § 148(2) factors thus undoubtedly weigh in favor of applying South Carolina consumer fraud law based on the same reasoning applied to Merrick's CFA claim in Count 8. Count Ten is therefore dismissed without prejudice to Merrick's right to replead its claim under South Carolina consumer fraud law.

Finally, with respect to Merrick's CFA claim in Count Eight as subrogee of Direct Air's customers, the above analysis would apply with equal force to any customer residing in or domiciled outside of New Jersey who also relied upon and received Valley's representations outside the state. Thus, any such plaintiff could not maintain a CFA claim. As for Direct Air customers with stronger connections to New Jersey, the CFA may apply to those claims. Merrick fails, however, to allege any connection to New Jersey among Direct Air's customers. While it may be the case that at least some of the approximately 50,000 customers resided in New Jersey and received and relied upon Valley's alleged representations in New Jersey, the SAC is devoid of any such allegations and the issue has not been briefed. Therefore, the Court will dismiss Count eight without prejudice to Merrick's right to augment its pleadings with facts providing a connection to New Jersey among at least some of Direct Air's customers.[10]

---

[10] On a final note, the § 6 factors mentioned supra would also weigh against application of the CFA. See Maniscalco, 709 F.3d at 209-10.

### III. CONCLUSION

      For the reasons set forth above, Defendants' Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART**.  An appropriate order will follow.

                                                s/ *Madeline Cox Arleo*
                                                **MADELINE COX ARLEO**
                                                **UNITED STATES DISTRICT JUDGE**